## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:15-cr-228 |
| | : | |
| | : | Judge George C. Smith |
| | : | |
| | : | Magistrate Judge Deavers |
| v. | : | |
| | : | |
| JOHN P. RAPHAEL, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant John P. Raphael, by and through his attorneys, respectfully submits this Sentencing Memorandum for the Court's consideration in fashioning a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Defendant is scheduled to be sentenced on Wednesday, June 8, 2016, at 12:30 pm.

## I.      Introduction

By unsealing and making public its case against Karen L. Finley, the former CEO of Redflex Traffic Systems, Inc., on June 19, 2015, the government unleashed a torrent of incessant speculation, media frenzy, rumor and innuendo, consisting mostly of inaccurate accounts and portrayals about John Raphael's supposed participation in and orchestration of a bribery or "pay to play" scheme involving elected public officials in the City of Columbus. Yet to this day, the government has neither elicited nor made public any proof or evidence of any bribery or "pay to play" scheme implicating Mr. Raphael or any elected public official in the City of Columbus.

109981.000001/#4836-3998-8014 v1

So, as Mr. Raphael stands before the Court for sentencing, let's be clear: **John Raphael is not charged with, has not pled guilty to, and has not engaged in, bribery of elected public officials, nor has he engaged in acts of public corruption or a "pay to play" scheme.**  The conduct with which he has been charged and to which he has pled guilty is interference with commerce by threats -- a violation of 18 U.S.C. § 1951(a)— conduct which involves and relates solely to his interaction with Redflex Traffic Systems ("Redflex"), a former client of Mr. Raphael's lobbying and consulting business.

This Sentencing Memorandum will address this offense and appropriate sentence to be imposed, in the context of the factors of 18 U.S.C. § 3553(a)(2), including and by reference to the sentences imposed against former Redflex senior executives Aaron M. Rosenberg, Executive Vice President ("EVP") of Sales and Karen L. Finley, Chief Executive Officer.  Mr. Rosenberg and Ms. Finley have each pled guilty in this Court to, *inter alia*, conspiracy to bribe elected public officials in connection with the expansion of the Redflex red light contract in Columbus.

 For his guilty plea to 2 counts of conspiracy involving bribery of elected public officials and honest services fraud, and facing 10 years of imprisonment, 3 years of supervised release, and a $250,000 fine, Rosenberg entered into a pretrial diversion agreement with the United States Attorney for the Southern District of Ohio.  That agreement "sentenced" him to minimal home confinement, 100 hours of community service and 10 hour of ethics training in the State of Ohio.  At the end of 12 months, the government dismissed the information and dropped all charges against Rosenberg.  Thus, he served no term of imprisonment or supervised release and was convicted of no charges regarding his actions on behalf of Redflex in Ohio.

For her guilty plea to conspiracy to engage in bribery of elected public officials, Finley is scheduled to be sentenced, initially in the Northern District of Illinois on June 21, 2016 (see

discussion, *infra*), and by agreement of the United States Attorney for the Southern District of Ohio, any term of imprisonment and supervised release imposed by that court will run concurrently with any sentence imposed by this Court.

In recommending their sentence for Mr. Raphael, neither the United States Probation Office nor the government compare or contrast the offense level or sentence in either the *Rosenberg* or *Finley* cases, to the instant matter, notwithstanding the directive of 18 U.S.C. § 3553(a)(6) "to avoid unwarranted sentencing disparities among defendants with similar records who have found guilty of similar conduct." The PSR recommends a term of imprisonment of 46 months, one (1) year supervised release, and a $10,000 fine, while the government urges a sentence at the high end of the applicable guideline range (Level 21), and a more than minimum fine.

The Court will surely note that Mr. Raphael is the only one of these three (3) individuals who was not charged with nor pled guilty to conspiracy or bribery involving an elected public official. As will be demonstrated in this Memorandum and at the Sentencing Hearing, the imposition of a sentence here of the magnitude recommended in the PSR or advocated by the government is neither justified under the facts nor the law, common sense, or fairness, and is by any standard objectively greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## II.     Factual Background

### A.     Redflex, Aaron Rosenberg & Karen Finley

In fashioning a sentence for the actions of Mr. Raphael in Columbus, an understanding of some of the now publicly available and known activities of Redflex, Rosenberg and Finley between 2003 and 2015 is contextually appropriate. This includes civil lawsuits and countersuits between Redflex and Rosenberg; internal Redflex investigations of reported criminal activity

involving Rosenberg and Finley; the indictments of Finley and the resulting trial and conviction of a Chicago city official in the Northern District of Illinois. The comparisons between these events and the conduct to be considered by the Court of Mr. Raphael and his client, Redflex here in Columbus, vividly illustrate the stark contrasts and differing conclusions to be drawn.

Redflex is a Delaware corporation and a wholly-owned subsidiary of Redflex Holdings, Ltd., an international corporation whose stock is listed on the Australian Securities Exchange. Beginning in early October, 2012, following published reports in the *Chicago Tribune* raising questions in connection with the red-light camera contracts Redflex held with the city of Chicago, Redflex Holdings began an internal investigation. The investigation was occasioned by allegations of payments by and through a Redflex consultant in Chicago to a city employee who was in charge of the red light program; in addition to gifts, vacation related expenses, and other items of value were paid by Redflex to that Chicago city employee relating to the red light camera contracts.

The investigation uncovered violations of Redflex company policy and code of conduct by Mr. Rosenberg, as well as by its then CEO, Karen Finley. "The former CEO knew about and approved some of these trips and expenses. The former CEO also approved all of the former EVP's and consultant's reimbursement requests, though the failure to provide appropriate details and documentation clearly violated company policies." (*See*, Exhibit A.)

The investigative summary stated that "the two former Redflex officials most involved in the consultant/city program manager arrangement (the former CEO [Finley] and former EVP [Rosenberg]) had knowledge that would have made any reasonable person highly suspicious that this was a bribery scheme, and they acted improperly in allowing this arrangement to occur." The March 4, 2013 summary concluded that "the arrangement between the city [of Chicago] program manager, the consultant, and Redflex will likely be considered bribery by the authorities."

B. ***United States v. John Bills, et al.***
   ***Case No. 1:14-cv-00135 (N.D. Ill.)***

On August 13, 2014, a federal grand jury in Chicago returned a 23 count indictment in the United States District Court for the Northern District of Illinois alleging that Redflex officials, including Ms. Finley, provided a city official, John Bills, with cash and other personal benefits in exchange for inside information and assisting Redflex in obtaining, keeping and expanding its Chicago contracts. As described in the Indictment, Ms. Finley, Mr. Rosenberg and other officials of Redflex arranged to funnel the cash and benefits to Bills through Marty O'Malley, a friend of Bills. O'Malley was hired by Redflex as an independent contractor, and O'Malley passed as much as $2,000,000.00 to Bills, money funneled to him by Rosenberg, with Finley's knowledge. (*See* Exhibit B.)

Finley and O'Malley both entered voluntary guilty pleas to conspiracy to commit federal program bribery by paying bribes in exchange for the City of Chicago red light camera contracts. Finley and O'Malley admitted, among other things, that between January 2002 and June 30, 2011, they conspired with John Bills, Aaron Rosenberg, and each other to corruptly give, offer and agree to give things of value, namely cash payments in excess of $2 million and other personal financial benefits (through O'Malley) for his and Bills' benefit, with intent to influence and reward Bills in connection with the City of Chicago contracts.

Bills pled not guilty, and on January 26, 2016, he was convicted on all 20 counts of the Indictment involving his conduct. The jury determined that Bills took up to $2,000,000.00 in bribes and gifts, in return for steering millions of dollars in red light camera contracts to Redflex. Both Rosenberg and Finley testified for the government at trial.

As stated by the Court in the Jury Instructions (attached hereto as Exhibit C, at p.13):

> You have heard testimony from **Aaron Rosenberg**, who is cooperating with the government and is expecting a benefit in return for his testimony, namely, immunity from prosecution in the matter that is before you in the Northern District of Illinois. In addition, **Aaron Rosenberg** has admitted to lying under oath. Aaron Rosenberg also entered into an agreement with the government relating to a criminal matter in the Southern District of Ohio whereby, in return for his cooperation, charges were dismissed after one year of successful probation.

The "immunity from prosecution" entered into between Rosenberg and the United States Attorney for the Northern District of Illinois is attached hereto as Exhibit D. The one-year pretrial diversion agreement entered into by and between Rosenberg and the United States Attorney for the Southern District of Ohio is also attached hereto as Exhibit E, and discussed in greater detail, *infra*.

The *Bills* Jury Instructions regarding the trial testimony of Ms. Finley state (Exhibit C at p. 13):

> You have also heard testimony from **Karen Finley**, who has entered into an agreement with the government and stated her involvement in some of the crimes the defendant is charged with committing. You may not consider her agreement as evidence against the defendant. **Karen Finley** is cooperating with the government and is expecting a benefit in return for her testimony, namely that her sentence can be no greater than 5 years imprisonment, which is lower than the advisory sentence applicable under the United States Sentencing Guidelines. In addition, **Karen Finley** has admitted to lying under oath**. Karen Finley** also entered into an agreement with the government in the Southern District of Ohio whereby, in return for her cooperation, whatever sentence she receives in that district will run concurrent to the sentence that she receives in the matter that is before you in the Northern District of Illinois.

Finley is scheduled to be sentenced by the District Court in Illinois on June 21, 2016, and her status before this Court, as well as her criminal history is discussed, *infra*.

C.  ***Redflex Traffic Systems, Inc. v. Aaron Rosenberg***
    **Case No. CV2013-00116 (Superior Court of Arizona, Maricopa County)**

On February 20, 2013, following Redflex's internal investigation of the Chicago allegations, Aaron M. Rosenberg was terminated by Redflex as its Executive Vice President of

Sales and Business Development.  On the same day, Redflex filed a lawsuit against Rosenberg in the Arizona Superior Court of Maricopa County claiming that he had engaged in an intentional and secret scheme to misappropriate funds and to commit dishonest and unethical acts.  The "wrongful acts" by Rosenberg that formed the basis of the suit related to the scheme involving Bills and O'Malley and the city of Chicago red light camera contract.

Rosenberg filed a Counterclaim against Redflex alleging that "Redflex instilled in him its practice of lavishly providing customers, including governmental officials, with perquisites and gifts in various forms.  This practice was a result of decisions made by Redflex's President and Chief Executive Officer [Karen Finley] as well as Redflex's board of directors.  In complying with the directives of these officials, Aaron Rosenberg was simply 'carrying out orders.'" (Counterclaim of Aaron M. Rosenberg, at ¶2.)  Rosenberg's Counterclaim goes on to say that while employed by Redflex, that "Redflex bestowed gifts and bribes on company officials in dozens of municipalities within, but not limited to the following states: California, Washington, Arizona, New Mexico, Texas, Colorado, Massachusetts, North Carolina, Florida, New Jersey, Tennessee, Virginia and Georgia." (*Id.*, at ¶3.)  **Noticeably absent from the listing of the municipalities and/or states in which Rosenberg claims there was bribery is Columbus, Ohio!**

During the two (2) years of pleadings, motion practice and pretrial discovery in the Redflex and Rosenberg litigation, the illegal activities engaged in by Redflex (done at the time with the knowledge of and voluntary participation by both Finley and Rosenberg) were openly disclosed and acknowledged.  Yet not once was either Ohio or Columbus mentioned in connection with any of those illegal activities, by either Rosenberg or Redflex.

For example, during his deposition, Rosenberg was asked whether he believed any of the practices of Redflex in the city of Chicago were inappropriate.   He answered: "I know that some

of the things we did in Chicago were wrongful and shouldn't have been - - were inappropriate to do." (Tr., 77, ll. 7-9.)  When asked to tell everything he knew that was done in Chicago that was wrong, Rosenberg answered: "The thing that I know is wrong is that the company, that the CEO, that the chairman and others encouraged and were aware of, was utilizing Marty O'Malley to provide incentive funding money to John Bills." (Tr., 78, ll. 8-11.)

Conceding that he "knew that was wrong." (*Id.,* I. 13), Rosenberg goes on in his testimony to admit that he knew about that conduct at the time it was taking place (*Id.*) and he knew "that was not something that was right." (*Id.*, 19-21.)   In fact, Rosenberg admitted and acknowledged that he dealt directly with John Bills who asked him about Redflex paying something to Bills (Tr., 177, ll. 1-7).  Rosenberg went on to admit that he approved O'Malley's invoices to Redflex knowing that some of that money was going to go back as a payoff /bribe to John Bills. (Id., 79.) He knew at that time this was happening that it was wrong. (*Id.)*  Still, he did nothing to stop this bribery scheme, even though these events occurred while Rosenberg was one of only 3 senior executives at Redflex.  He was part of leadership of the company. (Tr., 150, ll. 16-19.)

Once the *Chicago Tribune* stories were published in 2012, Redflex retained outside legal counsel to conduct an investigation.  Rosenberg was interviewed as part of that investigation. When asked in his deposition about the truthfulness of his responses during the investigation, Rosenberg admitted that he lied when questioned, and said he was told by Karen Finley to lie and to maintain their story that was a fabrication. (Tr., 253-255.)  Once these issues came to public light, Rosenberg was asked by Finley to create a letter for Bills to sign "to maintain the story that was concocted by the CEO of Redflex to maintain the fabrication." (Tr., 258.)

After more than two (2) years of acrimonious litigation, marked by voluminous pleadings, lengthy depositions, and finger-pointing, Rosenberg and Redflex jointly dismissed the lawsuit in

2015.  The terms and conditions of the resolution that was reached remain unknown since the settlement is sealed and therefore confidential.  Still, there was no mention of any illegal activities or conduct by Rosenberg or Redflex in Ohio or Columbus.

D. *City of Chicago, ex rel. Rosenberg v. Redflex Traffic Systems*
Case No. 15-cv-08271 (N.D. Ill.)

Not only did Rosenberg bring claims against Redflex in the Arizona litigation, but he also launched a "whistleblower" suit against Redflex under the City of Chicago's False Claims Ordinance on April 15, 2014, seeking damages in excess of $300MM, civil penalties and a judgment in his favor for a percentage of the total judgment awarded against Redflex.  Filed initially in the Circuit Court of Cook County, Illinois (Case No. 2014L004211), this action reveals the lack of remorse on Rosenberg's part for his criminal conduct, and displays an utter lack of acceptance of responsibility for his actions.

Ironically, and incredibly, Rosenberg has asked to be awarded millions of dollars as a result of this action, which is little more than a regurgitation of illegal conduct and illegal activities in which he participated, and as a result, had firsthand knowledge of the criminal conduct that culminated in the Indictments against Finley, Bills, and O'Malley, the criminal conduct was, of course, the bribery and kickback scheme Rosenberg knowingly participated in with Finley, O'Malley and Bills to defraud the City of Chicago!

Rosenberg's action, initially filed in State Court, was removed to the District Court, and a copy of his First Amended Complaint against Redflex is attached hereto as Exhibit F.  The 53 page, 379 paragraph, Six Count First Amended Complaint recites a litany of Redflex's criminal activities over the 10 year period of 2003 through 2013, in which Rosenberg and Finley knowingly participated.  **Rosenberg states categorically that "he was intimately involved in and has extensive knowledge of Redflex's systematic bribery of Bills"** and that he has "direct,

independent knowledge of the information" on which his allegations are based. (*Id.*, at ¶¶18-19; emphasis supplied.)   The First Amended Complaint exhaustively details and alleges the false claims, bribery scheme, the civil conspiracy and its participants, the payoffs and kickbacks, and the directives of Redflex senior executives, while somehow attempting to distance and minimize Rosenberg's personal involvement and culpability.

Rosenberg has admitted to engaging in conspiracy to commit bribery and engaging in acts of bribery during the course of: (i) criminal proceedings in Illinois, in which he was a witness; (ii) pleadings and in deposition in a civil lawsuit between he and Redflex in Arizona; and, (iii) a whistleblower action he initiated against Redflex in 2014 seeking to recover millions of dollars for himself, while admitting his criminal activities for which he can no longer be prosecuted!  Nowhere in these three (3) proceedings is there a single mention of or reference by Rosenberg, in his pleadings or testimony, to any illegal activities or conduct by him or Redflex in Columbus, Ohio.

In the Court's consideration in fashioning a sentence here that is sufficient with the purposes of sentencing, this background and abbreviated litany of criminal conduct on the part of Redflex, Rosenberg and Finley is highly relevant and instructive.  More significantly, it stands in stark contrast to the disparate conduct of Mr. Raphael.  But unlike the immunity, pretrial diversion and accommodation of concurrent sentencing afforded to Mr. Rosenberg and Ms. Finley, as to Mr. Raphael, the government asks the Court to sentence him to a term of imprisonment of as many as 37 months--- although he is the only one of the three who has not been charged with, pled guilty to, or engaged in the bribery of elected public officials!  The government seeks a sentence that is far greater than necessary or warranted, and one that the Court should reject within the context of the advisory guidelines, the sentencing factors of 18 U.S.C. § 3553(a)(2) and the exercise of its common sense.

### III.  The Guideline Calculation

The initial and final Presentence Investigation Reports ("PSR") accurately recite that Mr. Raphael pled guilty to a single count information charging him with a violation of 18 U.S.C. § 1951(a), and that pursuant to the United States Sentencing Guidelines ("U.S.S.G.") the base offense level was calculated utilizing U.S.S.G. §2C1.1. Both the government and Defendant objected to the draft PSR's proposed base offense level calculation because each viewed the appropriate guideline for Mr. Raphael's base offense calculation is U.S.S.G. § 2B3.2.

In response to the unresolved objection of the Defendant to the appropriate guideline used to calculate the base offense level under 18 U.S.C. §1951(a), and the government's concurrence with the Defendant's objection, the Probation Officer submitted an "Addendum to the Presentence Report."   The Addendum sets out the Probation Officer's consideration and determination of the guideline section deemed most appropriate to the offense of conviction.  The Addendum concludes with the following Paragraph:

> Should the objection be sustained, the resulting total offense level would be 16 as follows: base offense level of 18 under U.S.S.G. §2b3.2(a); one level increase for the amount demanded under subsection (b)(2); and three level decrease for acceptance of responsibility under U.S.S.G. §3E1.1.   The guideline imprisonment range would be 21 to 27 months, falling within Zone D of the Sentencing Table.

As the Court is aware, a sentencing court is required to use the Guideline enlisted for the offense in Appendix A- Statutory Index if only one offense guideline is listed.  If, however, more than one guideline section is referenced for the particular statute, then the court must determine "which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted."   (See § 1B1.2, Applicable Guidelines, *Commentary* n.1).

Here, the Statutory Index for the Hobbs Act, 18 U.S.C. § 1951(a), specifies four (4) guideline provisions for Chapter Two "Offense Conduct" (2B3.1, 2B3.2, 2B3.3, 2C1.1), each of which has distinct "offense characteristics" depending on the nature and severity of the offense conduct. Mr. Raphael did not plead guilty to either Hobbs Act robbery (2B3.1), blackmail [or similar forms of extortion (i.e., bribery)] (2B3.3), or extortion under color of official right (2C1.1). Instead, he pled guilty to extortion by force or threat of [economic] injury or serious damage (2B3.2).

Accordingly, the guideline section "most appropriate for the offense conduct" charged in this information against Mr. Raphael under 18 U.S.C. § 1951(a) is found in U.S.S.G. § 2B3.2. On this the Government and the Defendant agree.

## IV.     Section 3553(a) Factors

When sentencing a defendant, the Court "must first calculate the guidelines range, and then consider what sentence is appropriate for the individual in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 555 U.S. 350, 129 S. Ct. 890, 891-892 (2009). Here, the government and the Defendant agree as to the calculation of the base offense level under the advisory guideline range, thereby leaving the "second step," the application of the criteria set forth in § 3553(a) to the facts and circumstances of Mr. Raphael's case as the remaining issue for sentencing.

### A.  The Advisory Guideline Range

Pursuant to U.S.S.G. § 2B3.2, the Defendant's **base offense level is 18**. The "Specific Offense Characteristics" for this guideline applicable to the Defendant's base offense level is increased here by the corresponding number of levels from the table in § 2B3.1(b)(7), which amounts to a two-level increase to 20, pursuant to § 2B3.2(b)(2). Again, on this, the government

and the Defendant agree. There are no other "Specific Offense Characteristics" or adjustments enumerated under U.S.S.G. § 2B3.2 (b) or (c) that are applicable here.

**Defendant's total offense level, following the adjustment for acceptance of responsibility (and to which the government agrees), is 17.** It is undisputed that the Defendant's Criminal History Category is I, rendering his advisory guideline range of imprisonment 24 to 30 months, falling within Zone D of the Sentencing Table. As described below, this advisory guideline range is just one of a number of factors the Court is to consider in determining and imposing Mr. Raphael's sentence under the facts and circumstances of this case.

### 1. The Defendant Did Not Engage in Obstructive Conduct

The PSR concludes that while consideration was given to applying a 2 level "enhancement" pursuant to U.S.S.G. § 3C1.1 (PSR at ¶33), no such enhancement was recommended or applied. This consideration relates to allegedly false statements made by Mr. Raphael at the time government agents appeared unannounced at his residence on the morning of June 3, 2015, at 7:30 AM to execute a search warrant and seize his personal and business records in the course of their search of the entire premises, and supposed statements made later to case agents in the course of the government's investigation. The government responded to the initial PSR by indicating its intent to argue that the total offense level be increased by 2 levels through application of an "obstruction enhancement."

The government has also signaled its intent to argue for a sentence "at the high end of the applicable guideline range" (i.e., at Level 21), in part because the defendant made allegedly false statements. As described in the PSR and left unchallenged by the government, these statements were not made under oath, did not impede or obstruct the investigation, and the materiality and/or falsity of these statements remains unverified. For these reasons alone, and even if such statements

were made by the Defendant, no adjustment or enhancement is supported by the guidelines under these facts or applicable law.

For an adjustment under U.S.S.G. § 3C1.1 to apply, (1) the defendant must willfully obstruct or impede (or attempt to do so) the administration of justice with respect to the investigation "of the instant offense of conviction" **and** (2) the obstructive conduct related to offense of conviction and any relevant conduct, or a closely related offense. Here, Mr. Raphael's allegedly false statements were not part of the offense of conviction, extortion, and simply are not "relevant conduct." *See e.g., United States v. Williams*, 693 F.3d 1067, 1076 (9th Cir.2012), where the court of appeals found error in the district court's imposition of an obstruction enhancement, noting that "the language of section 3C1.1 does not encompass any and all obstructive conduct" but only **willful attempts to obstruct in relation to the instant offense.** *Id.*, citing to *United States v. Ford*, 989 F. 3d 347, 352 (9th Cir. 1993) (emphasis supplied.)

Efforts by the government to impose an obstruction enhancement to Mr. Raphael's offense level should be rejected because they find no support in the PSR, section 3C1.1, or the facts.

### 2.  The Defendant Held No Position of Trust nor Used a Special Skill

Part B of Chapter 3 of the Guidelines "provides adjustments to the offense level based upon the role the defendant played in committing the offense." *Introductory Commentary*, Chapter 3, Part B- Role in the Offense. The PSR makes no "adjustment for Mr. Raphael's "role in the Offense" nor does it recommend that the Court consider making any adjustment under Part B. (PSR, ¶32.) Once again, however, the government takes a contrary position and argues that the defendant's proposed guideline calculation should be increased by two levels pursuant to §3B1.3. As with its proposed adjustment for obstruction, the government's positon is wrong. No matter

how much lipstick you put on a pig, it's still a pig! And no matter how much the government tries to swell the guideline calculations here, there simply are no facts to support its efforts.

U.S.S.G. §3B1.3 provides that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." As used in §3B1.3, Mr. Raphael never occupied "a position of public or private trust" vis-a-vis Redflex.

"Public or Private Trust" is defined in the *Application Notes* to the *Commentary* to §3B1.3 to mean a "position...characterized by professional or managerial discretion" and "for the adjustment to apply the position must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)." (*Id.*) The examples of where the adjustment could apply include an embezzlement of a client's funds by an attorney serving as a guardian; a bank executive's fraudulent loan scheme; or the criminal sexual abuse of a patient by physician under the guise of an examination.

"[T]he rationale for the sentencing enhancement [in §3B1.3] is virtually analogous to the type of punishment routinely administered for violating a fiduciary duty, which involves a higher duty than is placed upon persons that do not occupy positions of trust." *United States v. Gilliam*, 315 F.3d 614,618 (6th Cir.), *cert. denied*, 540 U.S. 1155, 124 S.Ct. 1160 (2004), (citing *United States v. Ragland*, 72 F.3d 500, 503 (6th Cir.1996)). And as for the examples in the guidelines of trust relationships, the court in *United States v. Tatum*, 518 F.3d 369 (6th Cir.2008), quoting *Gilliam* at 618, confirmed that such relationships "translate directly to the types of relationships where a 'fiduciary duty' exists by implication." 518 F.3d at 373. No such relationship existed between the Defendant and Redflex—expressly or implicitly.

Furthermore, there is no evidence in the record and nothing has been offered to date by the government that Mr. Raphael possesses the "special skill" required by §3B1.3, which for purposes of that section "refers to a skill not possessed by the general public and usually requiring substantial education, training or licensing." Mr. Raphael has note of these attributes – he has no college degree; is self-taught in his business, and has no professional licenses. Examples of the "special skill" contemplated here include "pilots, lawyers, doctors, accountants, chemists and demolition experts." *Application Note 4.* It is clear that Mr. Raphael does not possess such "special skill" within the definition, contemplation or common sense application of §3B1. Nor has the government established the manner or extent to which any supposed "special skill" on the part of Mr. Raphael **significantly** facilitated the commission or concealment of the offense under the Hobbs Act.

For all these reasons, and despite the government's invitation for the Court to go outside the record and consider matters not contained therein, there is no legitimate factual or legal basis on which to impose an adjustment to Mr. Raphael's offense level under section 3B1.3.

## A. The Nature and Circumstances of the Offense

The nature and circumstances of the offense to which Mr. Raphael (as well as Mr. Rosenberg and Ms. Finley) pled guilty stem from the award to Redflex of the contract to provide red-light photo enforcement services for the city of Columbus. Redflex was the unanimous recommendation in 2004 of the Red Light Photo Selection Committee to receive the red light camera contract or the City of Columbus. Legislation was enacted, approved and implemented by City Council and the Mayor in October of 2005.

The selection of Redflex as the photo enforcement service provider for the city of Columbus **predated** any contributions of funds from either Redflex, or Mr. Raphael, to any elected

public official in the city of Columbus. As discussed, *infra*, Mr. Rosenberg and Ms. Finley pled guilty to offenses of bribery of elected public officials in connection with the further expansion of the Redflex red light contract by City of Columbus. Unlike the offenses to which Mr. Rosenberg and Ms. Finley (including Chicago) have pled guilty, Mr. Raphael's plea of guilty is to interference with commerce by threats under 18 U.S.C. § 1951(a). He "obstructed commerce" by obtaining property from Redflex, with the company's consent, but by use of fear of economic harm – i.e., if Redflex did not make political contributions, Redflex was led by Mr. Raphael to believe it would lose its contracts with the city of Columbus, and as a result, suffer economic loss of the value of those contracts.

Monies were sent by Redflex to Mr. Raphael and deposited into his personal, as well as lobbying and consulting business accounts at The Raphael Company. In turn, Mr. Raphael made campaign contributions in his own name, in the names of his relatives, business associates, and friends. He provided invoices to Redflex which indicated the payments that were made to him were for "consulting services" or as a "success fee." During the almost eight (8) year period of his representation of Redflex, Mr. Raphael made $70,000 in political contributions in monies he requested and received from Redflex for that specific purpose-----a far cry from the $2,000,000 in bribes, kickbacks and gifts that Rosenberg and Finley orchestrated through O'Malley and Bills in Chicago!

### B. History and Characteristics of the Defendant

Mr. Raphael has been a lifelong resident of this community, and a participant in the public fabric of Columbus since the time he was an aide to then-city council member John P. Maloney, who also served as CEO of St. Stephen's Community House. For the past 30 years, the Defendant has been self-employed as a political consultant/lobbyist, representing companies and individuals

throughout Central Ohio, while at the same time he owned Patrick J's, a bar and restaurant located at 2711 North High Street in the Clintonville area, until its closing and ultimate sale on January 29, 2016.

Profoundly sorry for what he has done, and painfully aware of the fact that he has hurt those closest to him, and, for all practical purposes, destroyed the life he worked to build over the last forty (40) years, Mr. Raphael has taken responsibility for his conduct, understanding that his life will never be the same again. He has remained committed to his five siblings and devoted to the care of his aging and infirm mother, with whom he has lived and for whom he has cared the past 22 years

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

As previously noted, one of the factors set forth in 18 U.S.C. § 3553(a)(6) is "the need to avoid unwarranted sentence disparities among defendants with *similar records* who have been found guilty of *similar conduct*." (*Id.*, emphasis added). Generally the § 3553(a)(6) disparity in sentencing factor "concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct," *United States v. Carson*, 560 F.3d 566, 586 (6th Cir.2009). However, as discussed *infra*, the sentencing court may look to co-defendant disparity when fashioning a reasonable sentence.

Here, the Court should look to the "related cases" of Mr. Rosenberg and Ms. Finley in fashioning its sentence for Mr. Raphael. Prior to their guilty pleas in this Court, Mr. Rosenberg and Ms. Finley shared with Mr. Raphael the lack of any prior criminal history. The "offenses of conviction" of conspiracy to engage in bribery of elected officials (18 U.S.C. § 371) to which Mr. Rosenberg and Ms. Finley entered guilty pleas are statutorily harsher in all respects than Mr. Raphael's "offense of conviction."

All three engaged in conduct, albeit differing, yet arising out of a similar set of facts relating to the City of Columbus' contract with Redflex. Their cases are "similar" in that each pled guilty and accepted responsibility. The only readily discernible public difference is that Mr. Rosenberg and Ms. Finley "cooperated with the government" by testifying in the Chicago red light camera criminal trial. Mr. Raphael seems to be viewed by the government as "uncooperative" notwithstanding his proffer with the government because there have been no new or additional charges brought since his guilty plea. This is hardly Mr. Raphael's "fault" or recognized guideline or sentencing distinction between him and Rosenberg or Finley. To the contrary, as demonstrated in the balance of this Memorandum, any sentencing disparities among the three would be unjustified under and inconsistent with 18 U.S.C. § 3553(a)(6).

As between co-defendants, the United States Court of Appeals for the Sixth Circuit has noted that "[w]hen determining whether to vary downward from a properly calculated sentencing range, a district court may consider the sentencing disparity between co-defendants." *United States v. Douglas*, 634 F.3d 852, 864 (6th Cir.2011), citing *United States v. Presley*, 547 F.3d 625, 631-32 (6th Cir.2008) (explaining that district courts have discretion to consider sentencing disparities between co-defendants). Accord, *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir.2010). In *Presley*, the court noted that it considered the "need to avoid an unwarranted disparity" between the defendant's sentence and a co-defendant's sentence as "the most important consideration" in the context of § 3553(a)(6) factors. *Presley*, at 630. This same logic and discretion applies to the related guilty pleas in *Rosenberg* and *Finley*, especially and importantly here, where unlike Rosenberg and Finley, Mr. Raphael's offense of conviction involves neither conspiracy to engage in bribery of elected public officials, nor conspiracy to commit honest services fraud.

1.   ***United States v. Aaron M. Rosenberg***
     **Case No. 2:14-cr-00032-GCS (S.D. Ohio)**

Redflex operated photo enforcement systems in numerous cities in the United States and Canada, and as of 2005, was awarded a contract to operate red light photo enforcement systems in the City of Columbus. Subsequent to the award of this initial contract by the City of Columbus, between 2005 and February 2013, Rosenberg and Redflex worked with Mr. Raphael in connection with Redflex's then-nascent business it was seeking to expand in Columbus.

Mr. Rosenberg's guilty plea states that he provided campaign contributions to elected public officials in return for the elected public officials agreeing to take official acts on behalf of Redflex to obtain or retain contracts. *(See*, Statement of Facts, Doc #4-2 in *U.S.A. v. Rosenberg*, a copy of which is attached hereto as Exhibit G).

The possible maximum penalty for Mr. Rosenberg's plea of guilty to Count One of the Information was 5 years in prison; a fine of $250,000 or a fine of twice the pecuniary gain or losses; 3 years supervised release; and a $100 special assessment. By entering a plea of guilty to Count Two of the Information, Mr. Rosenberg faced a possible maximum penalty of 10 years in prison; a fine of $250,000 or twice the pecuniary gain or losses; 3 years supervised release, and a $100 special assessment.

In a sealed proceeding conducted February 19, 2014, Rosenberg pled guilty to the two-count felony information stated above. Rosenberg's Plea Agreement and Pretrial Diversion Agreement were signed by him on February 10, 2014. The Pretrial Diversion Agreement (Doc # 4-1) provided, in pertinent part, for: (i) duration of 12 months; (ii) if completed, termination of prosecution and no other offense instituted against him from the circumstances of the offense; (iii) upon completion, guilty plea withdrawn and information dismissed by the government; (iv) home confinement, but no ankle bracelet or GPS, and ability to work and travel; (v) 10 hours community

service each of the 12 months of the program; and, (vi) 10 hours of training through the California Fair Political Practices Commission website.

On October 7, 2015, the government moved for an Order to Dismiss the Information and Unseal the Pleadings and Records (filed under seal as Doc # 14.) On the 14th day of October, 2015, the Government moved to dismiss the two count information and to unseal the case against Mr. Rosenberg. He had completed the one (1) year of the pretrial diversion program as of that date, and as promised, the government dismissed all charges against Mr. Rosenberg and his guilty plea was withdrawn.

In sum, for admittedly engaging in the bribery of elected public officials on behalf of Redflex throughout the United States over a 10 year period; while earning a salary during those 10 years in the range of $500,000 per year, and more; for lying to investigators and others while under oath; and, despite acknowledging that he knew he was engaging in wrongful conduct and was in a corporate position to stop that conduct, Mr. Rosenberg was (a) granted immunity from prosecution in the Northern District of Illinois in *Bills*, (b) placed in pretrial diversion in the Southern District of Ohio, where the 2-count Information against him for conspiracy to commit bribery was dismissed by the Government; (c), all charges against him were dropped; and, (d) he did not pay any monetary fine!

### 2.   *United States v. Karen L. Finley* Case No. 2:15-cr-00148-GCS (S.D. Ohio)

In *U.S.A. v. Karen L. Finley*, the former CEO of Redflex, pled guilty on June 19, 2015, to conspiracy in violation of 18 U.S.C. § 371. The information charged Ms. Finley, *inter alia*, with conspiring to corruptly give something of value to officials of the city of Columbus with the intent to influence them in connection with a business; and, to deprive the citizens of Columbus of their

right to honest and faithful services of the elected officials through bribery and concealment of material information, in violation of 18 U.S.C. §§ 666(a)(2), 1341, 1343, and 1346.

As discussed *supra*, Ms. Finley entered a guilty plea to bribery charges after initially entering a plea of not guilty in *U.S.A. v. Karen Finley*, et al., Case No. 1:14-cr-00135-3 N.D. Ill). Ms. Finley is scheduled to be sentenced in Illinois on June 21, 2016. Her Plea Agreement (Doc. #4) with the Government in the Southern District of Ohio provides that "…any term of imprisonment and supervised release imposed in [Illinois]…will run concurrently with any sentence of imprisonment and supervised release imposed in [Ohio] …."

Ms. Finley's Plea Agreement further provides that by entering a plea of guilty to the One Count Information, she faces a term of imprisonment of five (5) years; a fine of $250,000 or a fine of twice the pecuniary gain or losses; and, a term of supervised release of three (3) year; and, a $100 special assessment. (*Id.*) Thus, even though she has pled guilty to conspiracy to engage in the bribery of elected public officials in two (2) distinct municipalities, Ms. Finley's as-of –yet unannounced sentence will be served concurrently, which as the Court is aware, significantly reduces the length of any possible term of imprisonment.

### 3.    Precedent in the Sixth Circuit

It stands to reason that avoiding sentencing disparities within the same Judicial District is equally deserving of the Court's consideration under 18 U.S.C. § 3553(a)(6). Thus, of apt comparison for the Court when fashioning a sentence for Mr. Raphael is the sentence (or lack thereof in the case of Rosenberg) imposed in the Northern District of Illinois and here in the Southern District of Ohio.

In Illinois, Rosenberg was given "immunity from prosecution" and therefore avoided any charge or resulting sentence. In Ohio, he was given diversion for 12 months, home confinement,

and all charges have since been dropped against him. The government, however, disagrees and in reply to the Defendant's objections and response to the initial PSR on this point said that it:

> …disagrees with the defendant's contention that the sentence imposed in Aaron Rosenberg's case warrants a downward departure or variance in the defendant's case. In addition to the fact that Mr. Rosenberg has been cooperating with the government's investigation in two different jurisdictions, the legal circumstances relating to Mr. Rosenberg's prosecution differs in several material respects from the present matter.

Apparently the government's position is that the more offenses one commits, the more serious the offense, and the more onerous the statutory penalties associated with the offense, the less the resulting sentence should be than that of a defendant who has pled guilty to a less serious and less penalized offense. Of course, the government's tortured reasoning is premised upon the defendant "cooperating with the government's investigation in two different jurisdictions." Such "cooperation" is the government's "quid pro quo," the "get out of jail free card" that it gave to Rosenberg by way of immunity in Chicago and pretrial diversion in Columbus, even though Rosenberg admittedly engaged in multiple conspiracies to bribe elected public officials and committed federal program fraud over a ten (10) year time period in dozens of municipalities within, but not limited to, at least a minimum of fifteen (15) states.

The government's position should be of concern to one and all, most of all to the Court which should discard such sentencing overtures. Equally troubling is the amorphous justification offered by the government for the lack of any sentence imposed upon Rosenberg and resulting comparability here because "the legal circumstances relating to Mr. Rosenberg's prosecution differs in several material respects from the present matter." The Court and defense counsel are left to guess at what this means, since the government has previously offered no explanation.

More on point, and thus more helpful to the Court are cases from this Judicial Circuit in which the offense of conviction involves more culpable conduct than that of Mr. Raphael, and yet in which the defendant received a dissimilar and disparate sentence from that urged here for Mr. Raphael by the government. For one example, let's look at the defendant in *United States v. Abbey*, 560 F.3d 513 (6th Cir.2009), who was a public official convicted of extortion under the Hobbs Act, as well as having been found guilty of conspiracy to bribe a public official and solicitation of a bribe by a public official.

In *Abbey*, the defendant, a former city administrator, received a free building lot from a land developer in exchange for unspecified future official favors. The jury found him guilty of conduct constituting three (3) separate crimes under two separate (2) statutes. **He was sentenced to fifteen (15) months in prison**. It is unknown from the text of the Opinion whether or not a monetary penalty or fine was imposed, or if so, in what amount. The defendant challenged his conviction under the Hobbs Act, as well as his sentence of imprisonment. On appeal, the Sixth Circuit affirmed the conviction and the sentence in all respects. 560 F.3d at 523.

Thus, in *Abbey*, a public official convicted of extortion under the Hobbs Act, **and** convicted of solicitation of a bribe **and** convicted of engaging in a conspiracy to bribe a public official, was sentenced to a term of imprisonment of only 15 months!!! By contrast, here the Court is being asked by the U.S. Probation Office and the government to sentence Mr. Raphael, a private citizen with no prior criminal history or conduct, who pled guilty to a violation of the Hobbs Act, who accepted responsibility for his actions and who was not involved in or with any conspiracy or other acts of bribery involving any elected public official, to a term of imprisonment of either 37-46 months (PSR, ¶66) or at the upper end of the guideline range of 30-37 months (Level 19).

There is no legitimate basis, apparent or proffered, for the disparity that results from the sentence which the government asks the Court to impose against Mr. Raphael from that imposed and upheld on appeal by the Sixth Circuit in *United States v. Abbey*, *supra*. There likely is no difference in the criminal histories of Messrs. Abbey and Raphael, yet their offenses of conviction, public official/private citizen status, and willingness to accept responsibility or go to trial could not be more dissimilar. The sentence sought here by the government creates an unwarranted and undeserved disparity, which is precisely what 18 U.S.C. § 3553(a)(6) instructs the sentencing judge to consider and avoid.

**V.      Conclusion**

Mr. Raphael created his problems by his own actions and acknowledges his guilt. He has already suffered greatly for his actions, but as attested to by the letters that have been separately furnished to the Court and the government, John Raphael is in no way a "bad man." He is at his core a good, decent man, a very good son, and a very good brother.

Taking into to consideration the unique circumstances presented by this case, Mr. Raphael respectfully requests that the Court fashion a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

[The remainder of this page has been intentionally left blank]

I09981.000001/#4836-3998-8014 v1

25

Respectfully submitted,

/s/ S. Michael Miller
S. Michael Miller      (0068882)
Roger P. Sugarman    (0012007)
KEGLER BROWN HILL + RITTER
A Legal Professional Association
65 East State Street, Suite 1800
Columbus, Ohio  43215
Telephone: (614)462-5400
Facsimile: (614) 464-2634
mmiller@keglerbrown.com
rsugarman@keglerbrown.com

*Attorneys for Defendant*
*John P. Raphael*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing DEFENDANT'S SENTENCING MEMORANDUM was filed with the Clerk of Courts via the CM/ECF System, and a copy hand-delivered to J. Michael Marous, Esq., Assistant United States Attorney, counsel for the government, on the 4th day of May, 2016,

*/s/ Roger P. Sugarman*
Roger P. Sugarman (0012007)